FLEMING, J., Associate Judge.
Landowners[1] appeal a final judgment affirming a property appraiser’s denial of an agricultural classification in 2006. The issue raised is one of first impression: *773 Whether the trial court erred in its application of section 193.461(3)(e), Florida Statutes (2006), in determining that the landowners were not entitled to an agricultural classification in 2006, after having been granted such classification by a Value Adjustment Board in 2004, because landowners had abandoned or discontinued such agricultural use.[2] We conclude that the trial court properly applied the statute and that its decision was supported by competent, substantial evidence. Greenwood v. Oates, 251 So.2d 665 (Fla.1971). Accordingly, we affirm.
Appellant Tilton bought 279 parcels of land (totaling 346 acres) for $13,000 in 1998. The parcels were scattered throughout an undeveloped residential subdivision known as Flagler Estates. Til-ton, who is experienced in timber and has run a sawmill since 1979, harvested timber on the land from 2000 to 2003.
In 2004, Tilton applied for the land to be classified as agricultural. Flagler County Property Appraiser, John Seay, denied the agricultural classification, stating there was “[n]ot a bona fide commer *774 cial agricultural endeavor as contemplated by Chapter 193, Florida Statutes.” Tilton appealed to the Flagler County Value Adjustment Board (“VAB”). After a hearing, a special magistrate resolved the conflicting testimony in Tilton’s favor and recommended granting the agricultural classification. He concluded that Tilton had established “credible use of the property as a legitimate agricultural operation at the present time,” noting that Tilton was knowledgeable and although his operation was not highly profitable, there was no such requirement under Florida law. The VAB granted the agricultural classification and the property appraiser did not appeal.
In 2005, the newly elected property appraiser, James Gardner, continued the agricultural classification without further inspection of Tilton’s land. However, in 2006, Gardner denied Tilton’s agricultural classification, finding: (1) “[^Insufficient evidence of care for the land in accordance with accepted agricultural practices;” (2) “[wjhile there is evidence of some agricultural activity, it is not sufficient to qualify as bona fide commercial agricultural use;” and (3) “[n]o evidence of an economically feasible operation to qualify as good faith commercial agricultural use under the law.”
Tilton again appealed to the VAB. After a hearing, a special magistrate recommended that the VAB sustain the property appraiser’s denial of agricultural classification, which the VAB followed. The special magistrate found that “the weight of the evidence in favor of the petitioner was not sufficient to overcome the conclusion that, as of January 1, 2006, the commercial agricultural use had been abandoned or discontinued .... ”
Tilton then filed suit against the property appraiser and the VAB [3] in circuit court, pursuant to chapter 194, Florida Statutes, challenging their denial of the agricultural classification. At trial, Tilton argued that section 193.461(3)(e), not section 193.461(3)(b), controlled the classification in this case. Because Tilton had obtained an agricultural classification from the VAB in 2004, he argued that he was entitled to an agricultural classification in subsequent years as long as he continued the same use of the property approved by the VAB in 2004. More precisely, Tilton argued that the VAB’s determination of bona fide agricultural use in 2004 was “res judicata” for purposes of future classifications and that the property appraiser was limited to determining whether such previously approved use had been abandoned, discontinued or diverted. Gardner countered that section 193.461(3)(e) did not remove his authority to make an annual determination pursuant to the factors listed in section 193.461(3)(b).
After hearing evidence and argument, the trial court ruled in favor of the property appraiser. The court focused on evidence of Tilton’s use of the land on January 1, 2006, observing that the only two uses of the land between 2004 and 2006 were continued harvesting of timber and buying and selling of parcels. Based on the testimony of Gardner’s experts, the court concluded that Tilton’s harvesting of timber alone, without any effort to promote regeneration evinced an abandonment, discontinuation of diversion to nonagricultural use. Specifically, in harvesting timber, Tilton did not leave sufficient seed trees to regenerate the harvested areas but failed to harvest water oaks, whose canopies inhibited regeneration. In addition, the court found that the condition of the property in relation *775 to natural regeneration had deteriorated because Tilton had allowed underbrush to flourish, which further inhibited natural regeneration, instead of eradicating it by-chopping, applying herbicide or burning it. With specific regard to burning, the court noted that Tilton’s efforts to have the Forestry Service burn the underbrush were commendable but nevertheless unsuccessful and that “whether or not the lands are classified agricultural depends on what is done, not on what is intended to be done.” (Emphasis in original). In contrast, the Court noted that most of what Tilton’s expert, Scott Sager, observed regarding activity to promote regeneration occurred after Gardner’s 2006 denial.
With regard to buying and selling parcels, the court noted in August 2005, Tilton contracted to sell his property — 332 tracts for $30,000 a tract — but the contract expired in December with Tilton having closed on 56 tracts. The court saw this activity as evidence that Tilton was no longer using the land for agricultural purposes under section 193.461(4)(a)(2), Florida Statutes. The court concluded as follows:
Since Plaintiffs’ lands were classified agricultural in 2005 what changed?
In 2006 Denton [Chief Forester of Greenbelt Consultants] and Hunter [Gardner’s Agricultural Supervisor], who the Court found to be highly credible, observed insufficient activity existed well before January 1st, 2006, to convince them and Gardner that the lands were being used primarily for bona fide agricultural purposes. In the six years Plaintiffs had owned most of the tracts the only forestry activity which had occurred was harvesting of trees. There had been no activity to ensure the natural regeneration process until after the 2006 denial. As testified by Denton the operation was a “cut and get out” forestry operation not consistent with good forestry practices. In those six years Plaintiffs had only harvested timber and bought and sold parcels of property. [Emphasis in original.]
As found by the Special Magistrate the Court finds that the weight of the evidence in favor of Plaintiffs is not sufficient to overcome the conclusion that as of January 1st, 2006, the agricultural use of the property had been abandoned or discontinued which was also probably true in 2004 and 2005. Pursuant to Section 193.461(4)(a)(2), F.S. the Property Appraiser reclassified the lands as nonagricultural. Greenwood v. Oates, 251 So.2d 665 (Fla.1971).
This appeal followed.
Both sides agree that section 193.461(3)(e) controls, but Tilton claims the trial court incorrectly denied him an agricultural classification using section 193.461(3)(b), instead. Tilton acknowledges that normally the standard of review is whether competent, substantial evidence supports the trial court’s fact-findings. Love PGI Partners, LP v. Schultz, 706 So.2d 887 (Fla. 5th DCA 1998). In this case, however, he argues for a de novo standard to the extent this Court needs to construe 193.461(3)(e) as a pure question of law. Id. at 893.
Tilton’s argument ignores the fact that the trial court applied section 193.461(3)(e) when it found “that the weight of the evidence in favor of Plaintiffs is not sufficient to overcome the conclusion that as of January 1, 2006, the agricultural use of the property had been abandoned or discontinued’ .... ” In so finding, the trial court expressly acknowledged that section 193.461(3)(e) applied, noting that the section provides for an automatic extension “unless certain changes have occurred.” *776 The court then recounted the changes it found had occurred from 2004 to 2006.
While it is clear that the trial court applied the proper statute, the question remains was 193.461(3)(e) applied correctly? The section was enacted in 2002 and has not been discussed in any reported cases. Thus, its application is a matter of first impression.
By its plain terms, section 193.461(3)(e) applies to land that has received an agricultural classification from a VAB or court in a prior year, presumably resulting from a landowner’s successful challenge of a property appraiser’s denial of the classification. That is what occurred in the instant case. In 2004, the property appraiser denied Tilton’s application for an agricultural classification. He appealed to the VAB, and the VAB granted the classification. Thus, the portion of Til-ton’s land subject to the 2004 VAB classification was “entitled to receive such classification in any subsequent year until such agricultural use of the land is abandoned or discontinued, the land is diverted to a nonagricultural use, or the land is reclassified as nonagricultural pursuant to subsection (4).”
Tilton argues that section 193.461(3)(e) seeks to protect landowners like him who have already survived a VAB action by prohibiting the property appraiser from making a de novo determination of whether the land is being used for bona fide agricultural purposes in subsequent years. Instead, of determining “bona fide agricultural purposes” pursuant to section 193.461(3)(b), Tilton notes that section 193.461(3)(e) limits the scope of the property appraiser to determining whether “such agricultural use” has been abandoned, discontinued, diverted or reclassified. Tilton asserts that the phrase “such agricultural use” does not mean “bona fide agricultural purposes” based on the factors listed in section 193.461(3)(b). Instead, Tilton claims that the property appraiser can only look at the actual use that was previously approved by the VAB and determine whether that use has been abandoned, discontinued, diverted or reclassified.
In evaluating whether the use has been abandoned or discontinued, or whether the land is no longer being utilized for agricultural purposes, the property appraiser must consider section 193.461(3)(e) in pari materia with the criteria listed in section 193.461(3)(b), which requires the property to be primarily used for bona fide agricultural purposes.[4] Tilton’s construction of the phrase “such agricultural use” in subsection (3)(e) ignores that (3)(b) specifically defines “bona fide agricultural purposes” as “good faith commercial agricultural use.” (Emphasis added.) So when 193.461(3)(e) speaks of “agricultural use ” it is linked to a bona fide agricultural purpose. This reading is reinforced by the fact that subsection (3)(e) does not nullify 193.461(4)(a)2. which requires the property appraiser to classify as nonagricultural: *777 “Land no longer being utilized for agricultural purposes.” (Emphasis added.) To the contrary, subsection (3)(e) expressly provides that land reclassified as nonagri-cultural pursuant to subsection (4) is not otherwise entitled to maintain its previous agricultural classification. In effect, subsection (3)(e) expands the property appraiser’s analysis to include “agricultural purposes” not just “agricultural use.” Finally, it should not escape notice that 193.461(3)(e) begins: “Notwithstanding the provisions of paragraph (a) ... ” (Section 193.461(3)(a) lays out the process by which the property appraiser classifies lands as agricultural.) The statute does NOT similarly provide that subsection (3)(e) is to be considered despite the provisions of (3)(b).
But if the property appraiser can consider bona fide agricultural purposes even after the landowner has prevailed in proceedings before a VAB or court, what is the landowner “entitled to” under 193.461(3)(e)? The answer lies in the approach the property appraiser is to take following a VAB or court determination that land is entitled to an agricultural classification. Clearly, a de novo determination by the property appraiser as to whether the land is being used for bona fide agricultural purposes would render section 193.461(3)(e) meaningless. To this extent we agree with Tilton’s position.[5]
However, we disagree that “evidence of some agricultural activity,” which Gardner did acknowledge, is all that is required to entitle Tilton to keep his agricultural classification.[6] This finding by Gardner is at the heart of Tilton’s claim that his agricultural use of the land had not been “abandoned or discontinued” as contemplated by section 193.461(3)(e). Although he won’t say as much, what Tilton is truly arguing is that only a finding of no agricultural use whatsoever would result in a loss of agricultural classification under the statute. In support of this extreme construction, he cites Webster’s Encyclopedic Unabridged Dictionary (1996 ed.) defining “abandoned” as “forsaken or deserted” and “discontinue” as “to put an end to; stop; terminate.” If so construed, an agricultural classification from a VAB or court would be akin to a license to use the land for virtually any purpose provided some meager agricultural use continues. In this regard, cutting down one tree a year and dragging it to “scarify” the land in hopes that a seedling might sprout would suffice.[7] There is no reason to believe the legislature meant to confer a tax benefit under such a circumstance.
Construing section 193.461(3)(e) in pari materia with the other provisions of section 193.461, we conclude that the property appraiser is constrained to presume that land is still being used primarily for *778 bona fide agricultural purposes and must limit the inquiry to what may have changed. If nothing has materially changed, then the property appraiser is powerless to deny an agricultural classification despite a belief that the current agricultural use is not bona fide.
On the other hand, if the land use has materially changed, then the property appraiser is free to consider the “bona fide” factors of section 193.461(3)(b) as they may relate to the changed condition in determining whether the agricultural use has been abandoned or discontinued. Thus, the trial court correctly asked: “Since Plaintiffs’ lands were classified agricultural in 2005 what changed?” The court was also correct in considering whether the changes meant the land was currently being used primarily for bona fide agricultural purposes.
Having determined that the trial court properly applied the correct law, we turn our attention to whether there was competent, substantial evidence supporting the trial court’s findings. Greenwood; RH Resorts, Ltd. v. Donegan 881 So.2d 1152 (Fla. 5th DCA 2004). In considering the sufficiency of such evidence it is important to consider that it is the physical use of the land, itself, that matters. “The favorable tax treatment provided by [section 193.461] is predicated on land use, that is, physical activity conducted on the land.” Straughn v. Tuck, 354 So.2d 368, 370 (Fla.1977) (citing Hausman v. Rudkin, 268 So.2d 407 (Fla. 4 th DCA 1972)).
In concluding that the agricultural use had been abandoned or discontinued, the trial court relied in part on the testimony of Gardner’s two experts, Denton and Hunter, who inspected the property in 2004 and 2006. In 2006, they observed that, like 2004, Tilton had done nothing but harvest timber. In fact, conditions on the property relating to natural regeneration were much worse than in 2004. He failed to leave seed trees to produce seeds for new trees. He failed to remove underbrush, which prevented the seeds from hitting the ground. He failed to disturb the ground and expose the soil so that it could better receive the seeds. He failed to remove water oaks, whose canopies inhibited natural regeneration and he failed to create firebreaks to prevent wildfires. In short, Tilton did nothing to promote natural regeneration in 2004 and 2005. As a result, in 2006 the land was less likely to produce timber than on January 1, 2004. The lack of sufficient natural regeneration and Tilton’s failure to promote regeneration supported the court’s conclusion that agricultural use had been abandoned or discontinued in 2004, 2005 and on January 1, 2006.[8]
Despite the VAB’s caveat in 2004 that Tilton had established “credible use of the property as a legitimate agricultural operation at the present time,” Tilton contends that worsening conditions did not equate to abandonment or discontinuation of agricultural use. (Emphasis added.) Instead he claims that the worsened condition of the land was consistent with his timber management plan,[9] was hampered *779 by drought, and did not overcome his harvesting of timber. The trial court found otherwise, choosing to believe that the worsened conditions were caused by Til-ton’s failure to take any action to promote regeneration. The trial court also noted that Tilton’s expert, Scott Sager, did not inspect the property until 2007 and 2008, thus any activity to promote regeneration that he observed occurred after the 2006 denial.
There was also testimony that in 2005, Tilton had attempted to sell all of his land for almost $10 million and had actually sold 56 parcels for $1,100,000. The court deemed this evidence particularly significant in relation to section 193.461(4)(a)(2), which requires the property appraiser to reclassify the land if it is no longer being used for agricultural purposes. From this evidence, the trial court could infer that in late 2005, Tilton was trying to sell his land rather than use it for agricultural purposes. Tilton claims such an inference is precluded by direct evidence that he continued to harvest timber on the land subject to the sales contract. The trial court made short work of this notion stating,
... I’ll just make a determination now that a landowner who contracts to sell his land with no reservation of right to harvest timber prior to the sale has no legal right to cut timber off the land any more than he has the right to remove a house.
Thus, the sales contract, the actual sales and Tilton’s cutting of timber without a reservation of rights all support the trial court’s conclusion that Tilton was no longer using the land primarily for agricultural purposes.
Because the trial court properly applied section 193.461(3)(e) and its findings were supported by competent, substantial evidence, we affirm.
AFFIRMED.
EVANDER and COHEN, JJ., concur.

. The landowners — Lawrence Tilton, his wife Donna Tilton, and his son Benjamin Tilton— are referred to collectively as "Tilton” because Lawrence Tilton is the major actor in the underlying events.

.The pertinent portions of section 193.461, Florida Statutes (2006) are set forth below: 193.461. Agricultural lands; classification and assessment; mandated eradication or quarantine program
[[Image here]]
(1) The property appraiser shall, on an annual basis, classify for assessment purposes all lands within the county as either agricultural or nonagricultural.
[[Image here]]
(3)(a) No lands shall be classified as agricultural lands unless a return is filed on or before March 1 of each year. The property appraiser, before so classifying such lands, may require the taxpayer or the taxpayer's representative to furnish the property appraiser such information as may reasonably be required to establish that such lands were actually used for a bona fide agricultural purpose. Failure to make timely application by March 1 shall constitute a waiver for 1 year of the privilege herein granted for agricultural assessment. However, an applicant who is qualified to receive an agricultural classification who fails to file an application by March 1 may file an application for the classification and may file, pursuant to s. 194.011(3), a petition with the value adjustment board requesting that the classification be granted....
[[Image here]]
(3)(b) Subject to the restrictions set out in this section, only lands which are used primarily for bona fide agricultural purposes shall be classified agricultural. "Bona fide agricultural purposes” means good faith commercial agricultural use of the land. In determining whether the use of the land for agricultural purposes is bona fide, the following factors may be taken into consideration:
1. The length of time the land has been so utilized;
2. Whether the use has been continuous;
3. The purchase price paid;
4. Size, as it relates to specific agricultural use;
5. Whether an indicated effort has been made to care sufficiently and adequately for the land in accordance with accepted commercial agricultural practices, including, without limitation, fertilizing, liming, tilling, mowing, reforesting, and other accepted agricultural practices;
6. Whether such land is under lease and, if so, the effective length, terms, and conditions of the lease; and
7. Such other factors as may from time to time become applicable.
[[Image here]]
3(e) Notwithstanding the provisions of paragraph (a), land that has received an agricultural classification from the value adjustment board or a court of competent jurisdiction pursuant to this section is entitled to receive such classification in any subsequent year until such agricultural use of the land is abandoned or discontinued, the land is diverted to a nonagricultural use, or the land is reclassified as nonagricultural pursuant to subsection (4)....
[[Image here]]
(4)(a) The property appraiser shall reclassify the following lands as nonagricultural:
1. Land diverted from an agricultural to a nonagricultural use.
2. Land no longer being utilized for agricultural purposes.
3. Land that has been zoned to a nonagricul-tural use at the request of the owner subsequent to the enactment of this law.

. The VAB was later dismissed from the lawsuit.

. Although predating the addition of subsection (3)(e), there is authority for construing the provisions of 193.461 in pari materia. Cases discussing subsection (4) have considered it in pari materia with subsection (3)(b). See, e.g., Markham v. Fogg, 458 So.2d 1122, 1126 (Fla.1984) (recognizing owner may rebut the mandatory reclassification by showing that the property is being used "primarily for bona fide agricultural purposes” in accordance with the seven factors in section 193.461(3)(b)); Straughn v. K & K Land Mgmt., Inc., 326 So.2d 421, 425 (Fla.1976) (recognizing owner may rebut the presumption of nonagricultural use created by a sale of the land for a purchase price of three or more times the agricultural assessment by coming forward "with evidence of 'special circumstances’ within the framework of section 193.461(3)(b), Florida Statutes, to establish that the land continues to be used for ‘bona fide agricultural purposes'.”).

.Gardner’s counsel attempted to persuade the trial court that section 193.46 l(3)(e) did not prohibit Gardner from making a de novo determination of bona fide agricultural purposes. Two cases were cited in support of this argument, both of which predated the statute. Container Corp. of America v. Long, 274 So.2d 571 (Fla. 1st DCA 1973), and Keith Investments, Inc. v. James, 220 So.2d 695 (Fla. 4th DCA 1969). Gardner does not cite these cases on appeal and it seems clear that section 193.461(3)(e) supersedes them where a VAB or court have granted an agricultural classification in a prior year.

. At trial, Gardner was asked if he considered cutting over 700 tons of timber for profit as agricultural activity. He replied: “cutting wood for profit, yes. And you can consider that agricultural], I guess.”

. Tilton asserted that simply harvesting timber helped "scarify” or prepare the ground for natural regeneration because the cut trees are dropped in a particular manner and then dragged or “skidded” over the land for removal.

. Tilton’s 2004 application shows timber was harvested as far back as 2000. There was expert testimony that five years would be the limit for allowing natural regeneration to occur before it would be necessary to take more active management activities such as prescribed burns, mechanical chopping, or herbicide application. In this regard, because of natural processes on the land, a "change” in the use of the land may occur despite the landowner's activities (or lack thereof) remaining constant.

. Tilton's 2004 timber management plan states: "Not planning to site prep and mechanically plant until the year 2010 and then only those areas that do not regenerate naturally.” The plan concludes with the curious *779 statement: "Someone familiar with the natural regeneration program would be unable to recognize it and unqualified to judge it as a bona fide agricultural endeavor.”